

FILED by _IG_ D.C.
ELECTRONIC

**SEPT 19, 2008**

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

IN THE UNITED STATES DISTRICT COURT IN AND FOR
THE SOUTHERN DISTRICT OF FLORIDA

## 08-22603-CIV-ALTONAGA/BROWN

JOHN B. THOMPSON,

           Plaintiff,

v.

THE FLORIDA BAR; THE SUPREME COURT OF FLORIDA; RAOUL G. CANTERO, INDIVIDUALLY; THE FOLLOWING INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES: CHIEF JUSTICE PEGGY A. QUINCE, JUSTICE CHARLES T. WELLS, JUSTICE HARRY LEE ANSTEAD, JUSTICE BARBARA J. PARIENTE, JUSTICE R. FRED LEWIS, JUSTICE KENNETH B. BELL, JUSTICE CHARLES T. CANADY; THE FOLLOWING INDIVIDUALLY: REFEREE DAVA J. TUNIS, BENEDICT KUEHNE, THE ESTATE OF STEVE CHAYKIN, BARNABY MIN, SHEILA TUMA, KEN BRYK, JAN WICHROWSKI, BARRY RICHARD; THE FOLLOWING FLORIDA BAR EMPLOYEES INDIVIDUALLY AND IN THEIR OFFICIAL CAPACITIES: JACK HARKNESS, JOHN BERRY, KEN MARVIN, PAUL HILL, MARY ELLEN BATEMAN; THE FOLLOWING FORMER FLORIDA BAR OFFICERS INDIVIDUALLY: KELLY OVERSTREET JOHNSON, ALAN BOOKMAN, HENRY COXE, FRANK ANGONES; THE FOLLOWING INDIVIDUALLY AS WELL AS IN THEIR OFFICIAL CAPACITIES WITH AND FOR THE FLORIDA BAR: PRESIDENT JOHN G. WHITE, PRESIDENT-ELECT JESSE DINER, BAR GOVERNORS RAMON ABADIN, ALVIN ALSOBROOK, ALLISON BETHEL, ROBERT BRUSH, ARNELL BRYANT-WILLIS, BRIAN BURGOON, DOMINIC CAPARELLO, JAY COHEN, JEWEL COLE, GREGORY COLEMAN, IAN COMISKY, DANIEL DECUBELLIS, MAYANNE DOWNS, CHARLES EBBETS, STEPHEN ECHSNER, EVIN GONZALEZ, NACY GREGOIRE, ROGER HAUGHEY, SCOTT HAWKINS, JACK HICKEY, DENNIS KAINEN, WILLIAM KALISH, LAIRD LILE, DENISE LYN, CLIFTON MCCLELLAND, SCOTT MCMILLEN, ERIC MEEKS, EUGENE PETTIS, DAVID PRATHER, ANDREW RINGERS, DAVID ROTHMAN, JULIET ROULHAC, CLIFFORD SANBORN, ANDREW SASSO, EDWIN SCALES, JOHN SCHICKEL, WILLIAM SCHIFINO, CLAY SCHNITKER, CARL SCHWAIT, LAWRENCE SELLERS, MURRAY SILVERSTEIN, LISA SMALL, JOHN STEWART, RICHARD TANNER, NORMAN VAUGHAN-BIRCH, FRANK WALKER, SAMUEL WELLS, and GWYNNE YOUNG.

           Defendants.

**COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND
FOR COMPENSATORY AND PUNITIVE DAMAGES**

1

Dockets.Justia.com

COMES NOW plaintiff John B. Thompson (Thompson), and sues the various defendants in their various and respective capacities, stating as follows:

## JURISDICTION

1. This federal court has subject matter jurisdiction under 42 USC 1983, 28 USC 1343(a)(3), 28 USC 1331, 28 USC 1367, and 28 USC 2201. Plaintiff seeks monetary damages well in excess of the minimum jurisdictional requirements of this court.

## VENUE

2. The Southern District of Florida is the appropriate venue for this action as the plaintiff and many of the defendants are located herein. Further, The Florida Bar, many of whose officers and employees are sued, has official Bar offices in this District. Additionally, many of the harmful acts engaged in by the various defendants have occurred here and have impacted the plaintiff here where he lives and works.

## THE PARTIES

3. The various defendants who are "persons" are sued in their various capacities, either individually or in their official capacities or both, depending upon their current employment status and function and the remedies against each under 42 USC 1983. Injunctive and declaratory relief are sought against certain defendant persons in their official capacities, and damages are sought against them in their individual capacities, as noted above in the full style of this case.

4. The Florida Bar (The Bar) claims to be a state agency and the "official arm" of the Florida Supreme Court for the stated purpose of regulating the profession of law in this state. The Supreme Court of Florida (Supreme Court) is the highest court in the

2

state, and it is charged with overseeing in the discharge of its regulatory, nonjudicial powers, The Bar.

5. Raoul Cantero was a Supreme Court Justice until he resigned recently and is liable individually for damages resulting from his various deprivations of plaintiff's rights, as more fully set forth below. He was, while a Supreme Court Justice, the apparent ringleader of the Supreme Court's and The Bar's to pervert legitimate disciplinary functions to achieve conformity within Bar that had and has absolutely nothing to do with "discipline." Cantero's own public pronouncements indicate that.

6. Defendant Chief Justice Quince, and Justices Wells, Anstead, Pariente, Lewis, Bell, and Canady are sued individually for damages resulting from their various deprivations of plaintiff's rights, as more fully set forth below. They are also sued for declaratory and injunctive relief for what amounts to prospective relief, as clearly provided for by 42 USC 1983, in their official capacities.

7. Defendants Tunis, Kuehne, the Estate of Steve Chaykin, Min, Tuma, Bryk, and Wichrowski are sued individually for damages, as it appears the harm they have done to Thompson through The Bar cannot be worsened by any additional illegal conduct on their parts, so declaratory and injunctive relief is not sought against them in their official capacities.

8. Defendant Barry Richard is outside counsel for The Bar and a partner in the law firm of Greenberg Traurig. He is a private sector collaborator with the other defendants, and he is sued individually for damages for his important role in depriving the plaintiff of his federal rights.

3

9. Defendants Harkness, Berry, Marvin, Hill, and Bateman, all employees of The Bar, are sued both individually for damages for harm already done in depriving plaintiff of his rights and also in their official capacities, as they still appear to have certain legal duties that could remedy and thus ameliorate some of the ongoing harm to plaintiff. They can be counted upon, however, to use their powers that they have in their official capacities to do additional harm to plaintiff.

10. Defendants Johnson, Bookman, Coxe, and Angones were all Presidents of The Bar, and during each of their one-year tenures in office, they collaborated with the other defendants to harm Thompson by depriving him of his rights. They are thus sued in their individual capacities for damages.

11. Defendants White, Diner, Abadin, Alsobrook, Bethel, Brush, Bryant-Willis, Burgoon, Caparello, Cohen, Cole, Coleman, Comisky, DeCubellis, Down, Ebbets, Echsner, Gonzalez, Gregoire, Haughey, Hawkins, Hickey, Kainen, Kalish, Lile, Lyn, McClelland, McMillen, Meeks, Pettis, Prather, Ringers Rothman, Roulhac, Sanborn, Sasso, Scales, Schickel, Schifino, Schnitker, Schwait, Sellers, Silverstein, Small, Stewart, Tanner, Vaughan-Birch, Walker, Wells, and Young are all current officers or Bar Governors who had and have a duty to oversee properly the disciplinary and other functions of The Bar and have utterly failed to do so, resulting in harm by way of deprivation of the rights of plaintiff, and so he sues them individually for damages. He also sues them in their official capacities for the purpose of securing declaratory and injunctive relief against them for their ongoing efforts to deprive plaintiff of his rights.

## PREFACE

12. Title 42 of the United States Code, Section 1983 provides in pertinent part as follows:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable..."

13. United States Supreme Court Justice Louis D. Brandeis explained well in *Olmstead v. U.S.* the reason why the sovereign is not above the law:

"Our government is the potent, the omnipresent teacher. For good or for ill, it teaches the whole people by its example. Crime is contagious. If the government becomes a law-breaker, it breeds contempt for law; it invites every man to become a law unto himself; it invites anarchy."

14. All of the defendants, jointly and severally, have labored arduously over the last forty-nine months to punish plaintiff John B. Thompson for his fully-protected First Amendment speech and activities. This illegal activity, some of which is criminal in nature, has not only harmed plaintiff egregiously but it has also served to impede salutary efforts by Thompson and others to help assure the public safety and health of innocent third parties. For twenty-one years plaintiff has been one of the leading voices and

activists against the illegal and harmful distribution of adult pornographic and violent entertainment to children.

15. Plaintiff Thompson has been honored recently by the American Freedom Foundation for his efforts *because* of these defendants' efforts, not in spite of them. It is important that all who read this complaint, most important the court itself, that the purpose of this suit is not to thwart The Bar's and the Supreme Court's legitimate goal of providing quality, ethical legal services to the public. But in the name of that honorable goal, lawyer regulation in this state has gotten off the tracks, and plaintiff seeks to get it back on track, not just for his sake but for the sake of our profession and for the sake of the public whom all lawyers are *supposed* to serve.

16. U.S. Supreme Court Justice William O. Douglas, warned in *Lathrop v. Donohue*, that eventually integrated state bars, if not held accountable to the federal Constitution, would become "goose-stepping brigades" bent on the ideological conformity of its professional members.

17. The defendants herein have become Douglas' "goose-stepping brigades." They have turned their disagreement with the social activism of the plaintiff, his criticism of the criminal activities of two corporations and their counsel, and his public criticism of the creeping excesses of this Bar and our Supreme Court into what amounts to a criminal libel action, prohibited by law, upon the urging of these two criminal corporate enterprises. The Bar's long-standing animus against Thompson has linked up with the greed-driven enmity to two corporations that illegally distribute adult entertainment to children, and the result has been a perfect storm of regulatory idiocy that threatens

"judicial independence" far more than anything plaintiff is accused of doing. Self-inflicted wounds are always the most cruel and most consequential.

18. The United States Government has found both of these entertainment corporations that are behind this hijacking of The Florida Bar's otherwise legitimate disciplinary functions to be scofflaws who have illegally distributed sexual material harmful to minors. One of these two companies has been repeatedly found by the United States Government to have engaged in illegal activities, and with enemies of this quality and depravity, plaintiff has needed few friends, but the few he has have helped bring him to the point this day of filing this long overdue federal lawsuit. Voltaire wrote, "It is dangerous to be right when the government is wrong." It has been dangerous to be the plaintiff, not because he has been unethical, but because he has been right.

19. Plaintiff begins in his partial recitation of the facts by noting that "1983" actions only require notice pleading, and thus facts sufficient to meet that standard are provided herein. Recitation of more facts, although they will ultimately be alleged and proven, is unnecessary and would lead to the defendants' anticipated assertions that this complaint is "rambling." So, in the desire to allege enough to proceed further:

## GENERAL FACTUAL ALLEGATIONS

20. In 1988, The Florida Bar (The Bar), commenced an effort to "discipline" Thompson for his faith-based and constitutionally protected social activism and public interest law practice. When The Bar first did that, Thompson had a thriving law practice. The Bar secured from the Supreme Court a bizarre order based upon the notion that "Jack Thompson's obsession against pornography renders him mentally disabled and thus unfit to practice law." The Supreme Court required Thompson to submit to a battery of forced

7

psychiatric and psychological tests done *by The Bar's own medical experts*, even to the point of testing Thompson for "brain damage."

21. While allegedly brain damaged and mentally ill, Thompson secured the first decency fines ever levied by the Federal Communications Commission for the illegal airing of pornographic material in violation of criminal statute 18 USC 1464. It is unclear what this success said about the mental acuity and health of his opponents.

22. The Bar and the Supreme Court's public attempt, nearly two decades ago, to pathologize Thompson's faith-based activism destroyed, for the first time, Thompson's legal career, as the *Miami Herald* and the local legal community paper asked "Is This Man Too Crazy to Practice Law?" The happy consequence, however, of this destructive, illegal effort by The Bar and the Supreme Court was that Thompson became the only officially Bar-certified sane lawyer in the State of Florida. Said The Bar's experts: "Jack Thompson is perfectly sane and simply pursuing his activist Christian faith."

23. The Bar's insurance carrier paid Thompson damages, in part because certain "smoking gun" documents discovered by Thompson to be in the possession of The Bar proved that certain radical gay rights operatives, inside of and outside The Bar, had been involved in this effort. Thompson has prominently opposed this radical gay rights agenda for two decades. Said the claims rep for The Bar's carrier: "This is the worst thing I have ever seen an insured do." The Bar had apparently learned its lesson not to use "discipline" to pursue its own social agenda. More recent events prove The Bar has learned nothing.

24. From 1992 until 2004, Thompson slowly and by the grace of God was able to restore his career, with a strong emphasis, in his public interest law practice, on efforts to

curtail the illegal distribution of adult pornographic and violent entertainment to minors, just as he had done commencing in 1987. If one is liberal politically, zealous social activism is rewarded by the folks who tend to run state bars the "Pro Bono Lawyer of the Year Award." Plaintiff wants no such award. He wants to be left alone, for if one is a conservative who zealously engages in public interest law, then he/she is a "religious nut," a "right-wing lunatic," a "neanderthal," a "homophobe," a "Fascist," or even "mentally disabled by virtue of his obsession," and he is clearly someone for The Bar to keep its eye on.

25. Indeed, a former disciplinary prosecutor for The Florida Bar, who is now in private practice, who must be deposed herein, has more than once told plaintiff that "The Florida Bar has an 'Enemies List' like Richard Nixon's of lawyers they monitor and prosecute. They maintain what they call a 'Black File' on these enemies, and they have one on me now which they refuse to produce," said this former Bar prosecutor who is now also suing The Florida Bar and the Florida Supreme Court in federal court in the Middle District of Florida.

26. During the years-long recent disciplinary proceedings against plaintiff, the plaintiff asked The Bar for his 'Black File," and The Bar responded by saying it would remove and/or redact portions of that file without generating a Privilege Log as to what had been purloined! This was and still is The Bar's official response, despite the fact that Florida's Rules of Civil Procedure are guaranteed by our Florida Bar Rules to govern discovery during the disciplinary process. If this court is to consider one factual allegation that cries out for declaratory and injunctive relief it is that one: The Bar has refused Thompson all meaningful discovery, even to the point of not telling him what has

been removed from his "Black File." This is a shocking denial of the most basic due process that defeats any and all of their cries that a federal court must "abstain" in the face of such a denial of Fourteenth Amendment-guarantee due process. In fact, a disciplinary defendant, such as Thompson, who is denied a defense can be convicted of anything, and indeed Thompson will be.

27. During the time that Thompson restored his career after The Bar's first assault on his right to earn a living as a lawyer, Thompson appeared in numerous public fora on the aforementioned legal and public matters that concerned him. As *amicus curiae,* he helped secure, in this very U.S. District Court, the first verdict in the history of the world that a sound recording was obscene. He persuaded Time Warner, then and now the largest communications company in the world, to pull a cop-killing song from store shelves worldwide. The rapper who authored "Cop Killer," Tracy Morrow, aka Ice-T, now plays a cop on television and participated in an NBC episode *Law and Order: SVU* about kids' copycatting violent video games in which the plaintiff was portrayed. This is an embarrassing irony apparently lost on the goose-stepping ideologues (to use Justice Douglas' description) who run The Florida Bar.

28. During this career restoration period, in April 1999, and in a moment that changed Thompson's life, Thompson predicted on NBC's *Today* show the "Columbine" school massacre a week before it happened, even identifying the specific movie and video game that would inspire and train Klebold and Harris to author what then was the worst school killing by students in American history.

29. A week after that broadcast prediction, Thompson appeared on CBS' *60 Minutes,* interviewed by Ed Bradley, because Bradley had seen Thompson's telecast

prediction, to help explain how murder simulation video games were spawning copycat violence by those who train on them, such as Columbine's Klebold and Harris.

30. All of this activity by Thompson then spawned appearances on more than 150 paid appearances on college campuses, more than 100 national and international television programs, and what was becoming Thompson's leadership of a national movement to restrict the marketing and sale of mature-rated violent and pornographic video games to children in order to better protect and preserve public safety. Scientific studies, using brain scans via MRI, were then beginning to be published by Harvad, Indiana, and Michigan State Universities affirming what Thompson was saying. Eventually the US Supreme Court cited these same brain scan studies to strike down, in a majority opinion authored by Justice Kennedy, the juvenile death penalty. Justice Kennedy noted that teen brains process violent material in a different part of the brain, and it is the portion that leads to impule-driven copycatting behavior. Thus, Thompson's activism and the reasons for it were finding support in the highest court in the land.

31. In 2004, Thompson secured a $495,000 fine by the FCC against the illegal airing of pornography on the *Howard Stern Show*. Subsequently, Thompson helped the FCC secure a $3.5 million fine and Consent Decree against Viacom/Infinity for the illegal airing of Stern's pornography on the public airwaves. Thompson and/or his views were having success within the federal executive branch, within the federal judiciary at its highest levels, and he was drafting and getting passed laws in state legislatures intended simply to stop the sale of adult-rated video games to minors, as is the law in every other civilized nation.

32.  As to Thompson's efforts against "shock radio" illegally broadcast during daylight hours to children in violation of the US Supreme Court's ruling in *FCC v. Pacifica*, Howard Stern then decided to flee terrestrial radio to occupy the safe harbor of subscription satellite radio, and before doing so Stern proclaimed, "This lunatic lawyer in Miami got me off the air." That back-handed compliment is found on the cover of Exhibit A, attached hereto and filed herewith, which is the Tyndale House book, *Out of Harm's Way*, which recounts in greater detail why, ultimately, this civil rights action against the named defendants is necessary and how it came to be.

33.  More specifically, *Out of Harm's Way*, is a searing expose' and indictment of The Florida Bar and the Supreme Court of Florida for its illegal use of "lawyer discipline" to impose ideological conformity upon Thompson.

34.  More specifically and as recounted in Exhibit A, in August 2004, The Florida Bar received and treated as a serious a disciplinary Bar complaint brought against Thompson by the broadcast company that had, in this South Florida media market, illegally broadcast the *Howard Stern Show*. This company could not win the battle at the FCC on the merits, so it decided to try to "shoot the messenger" with Bar complaints, lawsuits, death threats on and off the air, and harassment of Thompson. This broadcast company did this because its broadcast license was and still is in jeopardy by FCC revocation of that license because of Thompson's success against this station and against *Stern*.

35.  The Bar enthusiastically joined in this "shoot the messenger" strategy with this Bar complainant broadcast company because of The Bar's longstanding animus against Thompson and in furtherance of its desire to "get it right this time" by way of

payback for Thompson's having bested The Bar years earlier and having more recently written about it in Exhibit A.

36. When this harassment by this broadcaster, with the help of The Bar, did not deter Thompson in his efforts against its illegal activities, this broadcast company directed its lawyers to bring even more Florida Bar complaints against Thompson, and The Bar immediately knew and knows even now that these new complaints are grounded the perjury of the complainants.

37. With these radio broadcast industry "shoot the messenger" Bar complaints pending against him, Thompson, undeterred by them, in March 2005, appeared again on CBS' *60 Minutes*, this time upon the personal telephoned request of Ed Bradley. Thompson had just filed a lawsuit in state court in Alabama on behalf of three police officers slain by a teen who trained to do so on the cop-killing video game *Grand Theft Auto: Vice City*. Thompson was admitted *pro hac vice* in Alabama. Mr. Bradley felt so strongly about the need to alert the nation to the public safety hazard posed by teens' consumption of mature-rated, addictive, murder simulation, copy-catted video games that this outstanding journalist, Ed Bradley, got out of a sickbed, dying of leukemia, to come to Alabama to interview Thompson and others involved in the wrongful death lawsuit. Upon completing his tasks in Alabama, Mr. Bradley was rushed back to New York with a fever of 106 degrees and placed in ice water—a complication of the leukemia which eventually took his life.

38. Thus, in 2005, because of a) Thompson's appearance on *60 Minutes,* b) his very public collaboration with US Senator Hillary Clinton regarding the illegal embedding of pornography in the *Grand Theft Aut: San Andreas* video game, which

resulted in its worldwide recall and the loss of tens of millions of dollars to its maker c) the publication of an original article about Thompson's Alabama suit in *Reader's Digest*, the most widely-read publication in the world, and d) the October 2005 publication of Thompson's book, *Out of Harm's Way*, which book indicts these murder simulation games, the makers of those games struck back at Thompson through The Florida Bar. This company, Take-Two Interactive Software, Inc., directed its lawyers, the giant Philadelphia law firm of Blank Rome, to commence a broad, vicious, and illegal assault upon Thompson in a "shoot the messenger" strategy it copied from the radio broadcaster who had already commenced the same type of assault (see above).

39. Indeed, the two key lawyers in these two separate law firms, one of which represented the radio broadcasters of the *Howard Stern Show* and the other which represented the maker of the *Grand Theft Auto* games, Take-Two, were well known to one another. They were and are Republican lobbyists who are among the largest campaign cash bundlers to the Republican National Committee and to Bush-Cheney: Al Cardenas of Miami's Tew Cardenas and David Girard-diCarlo, the Chairman of Blank Rome. Girard-diCarlo's partner, Ian Comisky, is a defendant herein, as he has sat on The Florida Bar's Board of Governors from the time this Bar-based assault upon Thompson began until this very instant.

40. These two law firms collaborated and conspired with one another to harm Thompson, ultimately, through the "disciplinary" power The Florida Bar. On May 15, 2007, plaintiff met on Central Park West with Strauss Zelnick, the Chairman of Take-Two, who told Thompson that his company was "in a war" with Thompson and that it would "do whatever it takes to defeat him." Thompson prompted that comment by

complaining about The Bar complaints Take-Two had filed. Zelnick also said, in response to the fact that Take-Two continued to sell adult-rated games to kids, that "We will sell our games to anyone we like." Zelnick, by his own words, confirmed what his and his lawyers' use of The Florida Bar was—to protect his company's criminal enterprise. It had absolutely nothing to do with the "ethics" of Jack Thompson.

41. Similarly, Al Cardenas of Tew Cardenas, the Miami law firm that sought to protect its broadcast client from the license-revocation consequences of airing the *Howard Stern Show,* revealed through his partner, Larry Kellogg, that their Bar complaints were brought against Thompson because of Thompson's letter to Florida Governor Jeb Bush about his cash-bundling, lobbyist pal Al Cardenas' spouting Republican "family values" while at the same time fronting for Howard Stern's porn. This is an important admission, as it shows that two The Bar complainants who have conspired with one another and The Bar itself to harm Thompson, have done so in retaliation for Thompson's petition and other First Amendment speech against their criminal activities. Thus, The Bar complaints by the complainants and by The Bar itself are in retaliation for Thompson's public pronouncements on matters of great public interest. They are then nothing but regulatory SLAPP actions—Strategic Litigation Against Public Participation that is illegal by virtue of state and federal civil rights laws.

42. Thus, these two law firms, generated a host of baseless Bar complaints against Thompson designed to destroy and in fact end his career as a lawyer, and The Bar was delighted to collaborate with them not for any legitimate regulatory purpose but to pursue payback against Thompson for its defeat by him years earlier when it tried this the first time. Thompson strenuously complained of this hijacking of The Bar's and the

Supreme Court's legitimate disciplinary function by these corporate pornographers, in Exhibit A and elsewhere. Thompson complained about these *ultra vires* "disciplinary" acts, formally, to The Bar, to the Supreme Court, to The Bar's entire Board of Bar Governors, to outside counsel for The Bar, and to The Bar's staff, many or all of whom are named as defendants herein. They are named as defendants because each and every one of them knew or should have known that the Bar complaints brought against Thompson were fraudulent, that they were based upon perjury, and that they were clearly brought and prosecuted in violation of state and federal laws and constitutions. These SLAPP Bar complaints clearly violate The Florida Bar's own *Preamble* to its Bar Rules which prohibits the bringing of Bar complaints against an opponent as a means of collateral attack.

43. In January 2007, the Supreme Court, once again acceding to the wishes of The Bar, by allowing The Bar tail to wag the Supreme Court dog, just as it had similarly disastrously done so years earlier with its "Jack Thompson must be mentally ill" Order, pronounced its blessing on all of these SLAPP "disciplinary" complaints and in doing so arranged for Miami-Dade Circuit Court Judge Dava J. Tunis, through the appointment of Chief Judge Joseph Farina, to serve as Thompson's Bar Referee. Tunis had been placed on the bench by Governor Jeb Bush. She wound up refusing even to allow the issuance of a subpoena for Bush to discern his interaction with Al Cardenas on these Bar complaints. Tunis was chosen even though, or *because* of the fact, that she had absolutely no experience with Bar disciplinary matters. Since her appointment as Referee, The Bar has proposed a Rule that Referees must have extensive training to serve in that function, but this training comes too late for the novice Tunis to do anything other than rubber

stamp every single request of The Bar in its disciplinary proceedings against Thompson. It is not necessary for Thompson, in a 42 USC 1983 action, to prove ill motive or bad faith, so at the very least it is germane to note that Tunis, when it came to presiding over a complex disciplinary matter, was akin to having a high school biology student perform neurosurgery at Sloan Kettering. Whether because of motive or competence, the deprivation of Thompson's federal rights by this Referee without portfolio was the same.

44. While Tunis "presided" over the "disciplinary" SLAPP proceedings instigated by Thompson's litigation opponents, Tunis, upon the urging of The Bar, denied Thompson nearly all substantive and procedural due process. Discovery was not allowed. Witnesses could not be subpoenaed. Thompson could introduce no witnesses or documents into evidence at his trial. He was denied a continuance while he wife battled possibly terminal ovarian cancer. He was denied hearings on his constitutional defenses. He was told he had to leave his wife's side at the hospital, while she was in distress, to attend a hearing before Referee Tunis, or do so by cell phone. This was a locomotive Hell-bent on a destination, whether the due process bridge was washed out or not.

45. Thompson could cite even more unfortunate deprivations of his legal and constitutional rights by Tunis, upon the prompting of The Bar, but for the sake of brevity and because of the mere notice pleading requirements that govern this complaint, he need not do so. However, one example of The Bar's, the Supreme Court's, and their respective operatives', employees', and officers' errors, to be kind, that frame neatly how all defendants collaborated to deny Thompson any semblance of fair proceedings to achieve an illegal and unconstitutional end, is as follows:

46. Florida Bar Rules require, as do the ABA Model Rules upon which they are based, that any lawyer who allegedly engages in misconduct that adversely affects a foreign jurisdiction's tribunal **_shall_** be prosecuted under that foreign jurisdiction's Bar Rules. There is absolutely no wiggle room for any dispute on that clear Rule. Thompson had been admitted *pro hac vice* in Alabama, and it was his allegedly unethical conduct that supposedly impacted that tribunal. It was that jurisdiction's Rules that shall be applied.

47. Nevertheless, The Florida Bar and the Supreme Court charged Thompson with violations of both Alabama Bar Rules **_and_** Florida Bar Rules for his alleged conduct in and before the Alabama tribunal while admitted *pro hac vice* there, despite the unequivocal Florida Rule that a lawyer can be charged for violating only one jurisdiction's Rules for one set of behaviors and *only* for a violation of the Rules of *impacted* tribunal. The ABA's Comments about this Rule explain why state bars must do it this way and this way only. The Florida Bar formally accedes to this analysis and incorporates it into his "Choice of Law" Rule. Yet, Thompson went to trial for alleged violations of both sets of Rules, prepared to defend himself as to both Rules, which indeed differ from one another. The Alabama Bar Rules greatly favor Thompson, which explains what The Florida Bar and its hand-picked Referee Tunisthen did.

48. When Referee Tunis came to write her embarrassingly vituperative Final Referee's Report, which is devoid of any Findings of Fact, Thompson was adjudicated in the "Alabama Complaint" of being guilty of violating *Florida* Bar Rules. *The Referee's Report is completely devoid of any findings of fact or guilt or innocence as to Alabama Bar Rules—the only set of Rules under which Thompson could have been prosecuted.*

What is worse is that there is no mention of Thompson's innocence or guilty as to the Alabama Bar Rules he is alleged in the Supreme Court's complaint to have violated. It is as if the complaint did not exist. Thompson moved for a hearing on this issue. Referee Tunis deprived him of one, as she deprived him of hearings on other issues. This is not due process. This is "discipline" Soviet-style.

49. This failure to even deal with the charges in the Bar complaint is just one of the shocking and consequential denials of procedural and substantive due process, and it only begins to reveal what a sham *all* of the proceedings before Referee Tunis were. The famous "ham sandwich" was not just indicted but convicted, as any ham sandwich denied a defense would be.

50. Relatedly, because The Bar and the Supreme Court and their various operatives were depriving Thompson, through these "disciplinary" proceedings, of the most basic of his legal and constitutional rights, Thompson filed in this federal court for relief. He was entitled to it based upon ongoing deprivations of basic constitutional and other federal rights. In response to that suit, The Bar's outside counsel in the person of defendant Barry Richard of Greenberg Traurig, secured abstention by the federal court from interfering with these state bar proceedings on the basis of Mr. Richard's assurance to the federal courts that Thompson had an "adequate state remedy" to address his constitutional arguments and concerns, most notably before the Florida Bar's Board of Governors before his disciplinary trial. Leaving aside the fact that the law clearly provides a plaintiff such as Thompson injunctive relief then now for prospective deprivations, abstention theories notwithstanding, Mr. Richard brazenly cited to federal court Judge Adalberto Jordan, the case of *Mason v. Florida Bar* for the proposition that

because Thompson could, before trial, present his constitutional defenses to the Board of Governors and thereby seek relief, this federal court need not hear those constitutional defenses and grant prospective relief.

51. Abstention was granted. However, once Mr. Richard obtained abstention for his client, he and The Bar denied Thompson his right to appear before the Governors requested formally in writing. Wrote defendant Frank Angones, then Bar President: You have no right to appear before the Governors. This was "bait and switch" engaged in by all of The Bar and Supreme Court defendants, by and through defendant Barry Richard, that has been emblematic of the utter disregard by all of them for for the federal rights of plaintiff.

52. Repeatedly and through the disciplinary process of Thompson since 2004, The Bar, through its operatives, demanded once again that Thompson submit to coerced mental health exams in yet another illegal attempt to pathologize his faith-based activism. The Bar and others had learned *absolutely nothing* from this disastrous strategy the last time around more than a decade earlier. If this court does not appreciate the in other regards who deep was the bad faith of the defendants in other regards, it should appreciate the viciousness of these defendants in seeking yet again to publicly humiliate Thompson with forced mental health exams. The Bar knew what it was doing in demanding this, and it knew how baseless was the demand, as Thompson, at trial demanded a ruling from the Referee on whether such a demand would have to be met. The Bar immediately dropped the demand, as push had come to shove. It was a baseless demand used to avoid a possible resolution of this entire dispute. It was, in a strict legal sense, extortion.

53. To further prove the bad faith and the deprivation of honest services owed any Bar respondent, the first designated reviewer assigned in August 2004 to Thompson's cases was Bar Governor Ben Kuehne. The designated reviewer is the most important person in the entire disciplinary process. Kuehne has been a strong advocate for the radical gay rights agenda and clearly the last person in the world who should have been allowed to serve as designated reviewer of the guarantee of rights to Thompson by The Bar, given Thompson's visible anti-radical gay rights activities and The Bar's having been caught, previously, using "discipline" to punish him for his activities in that regard. Kuehne and Thompson had opposed one another in the most recent Miami-Dade County "gay rights ordinance" which has absolutely nothing to do with rights and everything to do with attempting to normalize perversion.

54. When Kuehne was indicted by the federal government for money laundering for the Medellin cocaine cartel, he was replaced with Thompson's new designated reviewer, Bar Governor Steve Chaykin. This was like going from Marx to Lenin. Chaykin had publicly announced on the pages of *The Florida Bar News* that "any lawyer who does not support gay adoption is outside the core values of The Bar" and is thus one with "the enemies of The Bar." Chaykin's radical gay right paranoia by which he called anyone who did not agree with him on this "outside the core values of The Bar" helps explain how and why Chaykin, before he died recently, was keenly intent upon using the "discipline" of Jack Thompson to try to destroy the career of one of this region's most visible opponents of radical "gay rights."

55. Indeed, when Thompson and The Bar were close to resolving this entire dispute through mediation which Thompson had sought, Chaykin scuttled the settlement

by demanding even more mental health exams for Thompson and an enhanced punishment beyond a 90-day suspension which had been preliminarily agreed to. Chaykin then, in retribution for Thompson's having sought federal relief from The Bar's ongoing excesses, which included this renewed demand for mental health exams by Chaykin, upped the demanded punishment for Thompson from 90 days to a three-year suspension with a reinstatement not assured, and then Chaykin went all the way to disbarment. Chaykin went this far, and outside The Bar's own sanction standards, because Thompson dared complain in federal court about the very retributive activities in which Chaykin was engaging on behalf of The Bar and the Supreme Court. Such retribution in retaliation for Thompson's First Amendment petitioning activity in federal court is federally-prosecirbed criminal activity by Chaykin and The Bar as well as a violation of our state's Anti-SLAPP statute, as will be more fully explained, *infra*.

56. To make matters even worse for all of the defendants named herein, and as it relates to The Bar's and Chaykin's insertion yet again as it had two decades earlier of its gay rights agenda into Thompson's disciplinary matters, all of Thompson's prosecution was transferred to the Orlando Bar office without explanation, but under Steve Chaykin's control. Why was this done, Referee Tunis asked at the very first hearing in this case before here in early 2007. ***The Bar refused to answer Referee Tunis' question***.

57. After Thompson's trial it became known, and only in the last few weeks, that this transfer to Orlando was done in order that Bar prosecutor Ken Bryk might participate in the illegal prosecutorial efforts to destroy Thompson's career. How so?

58. Ken Bryk, it turns out, is the head of the Central Florida Gay and Lesbian Law Association, and he is illegally moonlighting the running of that organization out of

his Orlando Florida Bar office. This gay organization meets in The Bar's own offices. Most likely the Christian Legal Society does not. The Florida Bar Foundation illegally funds the political activities of this political gay rights organization run by Bryk, and in doing so it imperils The Florida Bar Foundation's IRS 501(c) status. Just this week the IRS has informed Thompson that it has opened a formal investigation of this matter.

59. Bryk and The Bar had an ***absolute duty*** to disclose his prosecutorial bias, in the form of his radical gay rights agenda, so that Thompson might be aware of an explanation for his deprivation of Thompson's fundamental rights. This is all the more necessary by virtue of the fact that The Bar got caught doing just this the first time around. See the above-noted recounting of how the smoking guns in this regard were found in The Bar's files back in the early 1990's. This "fix" is exactly why The Florida Bar refused to answer Tunis' question as to why this case was transferred to Orlando. And now Thompson is asked, by way of a non-itemized Cost Affidavit, to pay The Florida Bar thousands of dollars in travel expenses for their gay rights lawyers to come to Florida and stay and prosecute Thompson here! Relatedly, Thompson, in yet another denial of basic due process, has been denied all requests to examine the affiant as to that Cost Affidavit. Thompson was even ordered by Referee Tunis not to speak at his own Sanctions "Hearing." Even the Nazi defendants at Nuremburg received more due process than this.

60. One of the allegedly unethical acts of which Thompson stands convicted is for his appearance on *60 Minutes* to warn the American people of a public safety hazard. Thompson is adjudicated ***guilty*** of going on *60 Minutes*.

61. Yet, there is not a single Bar Rule in Alabama or in Florida that prohibits such an appearance. There are no gag rules pertaining to civil matters in Alabama. No order was entered prohibiting Thompson from appearing on 60 Minutes, and in fact the presiding judge on the record approved of the appearance, yet Thompson stands convicted of appearing on *60 Minutes*, and the Florida Supreme Court is poised to disbar him for that other similarly dastardly deeds. No adjudicative proceeding was impacted by Thompson's appearance, as the criminal defendant video game-trained killer in Alabama was convicted on all counts despite Thompson's appearance, and three and one-half years later there is no trial date in the wrongful death civil matter. The notion that Thompson affected a civil jury in a trial whose date is not even set and did something wrong by going on *60 Minutes* in order to save lives is the ridiculous product of a collaboration among greedy corporate pornographers and a retaliatory state Bar and Supreme Court. It is an utter contrivance, and each and every defendant herein knows it.

62. Big Tobacco set out to destroy Geoffrey Weigand, the "insider" after he appeared on *60 Minutes*, and this is a page out of that corporate SLAPP playbook.

63. Nevertheless, Thompson now stands convicted and faces *permanent disbarment* on the recommendation of Referee Tunis because of a nine-day trial during which Thompson's first Bar prosecutor, Barnaby Min in the Miami Bar office, actually publicly libeled Thompson at an Internet news site, brazenly lying about what Thompson was doing at his trial. Thus, in a case in which Thompson was wrongly accused of interacting with the media on a matter of public safety, The Bar's own operative, Mr. Min, was lying in the media about Thompson while his trial was going on, thereby libeling him and further tarnishing his reputation in the legal and general communities.

64. In order to wind up this recitation of some of the more important facts, but by no means exhaustively listing and recounting all of them that are germane to this action, plaintiff further notes that Bar Referee Tunis, six of the seven Supreme Court Justices, as well as all Florida Bar employees, all failed to execute valid State Loyalty Oaths as mandated by Florida Statute 876.05. As such, all of their official actions taken against and pertaining to Thompson are without legal force and effect, although purporting to be taken under color of state law. Without valid State Loyalty Oaths, about which Thompson timely complained to the Supreme Court, none of the defendants herein required, including the Justices themselves to have them have any *jurisdiction* over any of these "disciplinary" matters.

65. Knowing just how grave this lack of oaths is, the Supreme Court entered an order in March 2008 which it called a "sanction" against Thompson for having vigorously sought relief from it for the improper discipline of Thompson. This "sanction" was entered in retaliation not only for Thompson's vigorous defense but also *because* Thompson raised the loyalty oath problem to the Supreme Court. What the Supreme Court is now doing to Thompson is thus clearly retribution for his whisle-blowing about their fatal lack of state- and federally-mandated loyalty oaths. This retribution is a clear reason for the Supreme Court's deprivation of Thompson's federal rights. We now know, as an aside, that Referee Tunis' loyalty was forged, per a State Attorney's formal finding.

66. Put simply, the Supreme Court, in violation of Florida Statute 454.18, which guarantees to every Florida resident the right to represent himself in any civil proceeding, entered a "sanction" stripping him of that legal as well as his Sixth Amendment right to

represent himself in the final days of his disciplinary proceedings. This denial of the right of self-representation is shared only by England's notorious Star Chamber. Thompson thus is unable even to seek review of the Referee's Report. The Supreme Court has knowingly used a "sanction" that might be appropriate against a vexatious plaintiff/litigant who foments litigation, to deprive him of the most fundamental constitutional right of all: to *defend* himself assert all of his other legal and constitutional rights in his disciplinary proceedings. If you gag a litigant, he can assert nothing. Thus, because Thompson exercised his First Amendment petition right, he was stripped of that right and all other federal rights.

67. This functional binding and gagging by the Supreme Court of a lawyer in continuous good standing for thirty-one years is a deprivation of his fundamental constitutional rights as a citizen that shocks the conscience and gives rise not only to the need for declaratory relief, injunctive relief, compensatory damages, but also punitive damages.

## COUNT I. COMPENSATORY DAMAGES AGAINST ALL DEFENDANTS SUED "INDIVIDUALLY" PURSUANT TO 42 USC 1983

68. Plaintiff incorporates paragraphs 1 through 67 into this count.

69. All personal defendants, which categorization excludes defendants The Florida Bar and the Florida Supreme Court, are sued in their "individual capacity," pursuant to 42 USC 1983, for compensatory and punitive damages, because of their past and present deprivation of Thompson's federal and constitutional rights.

70. These constitutional rights include Thompson's First Amendment rights of speech, religion, association, and petition. They also include his Fifth and Fourteenth Amendment rights to substantive and procedural due process and equal protection. They

include his Sixth Amendment right to self-representation. They include his Eighth Amendment right against cruel and unusual punishment, as the disciplinary punishment sought by them is wholly at odds with standards of punishment.

71. In addition, these defendants, sued in their individual capacities, have denied Thompson "honest services," as mandated by 18 USC 1346. In addition to what has already been related, defendant Tunis received campaign cash monies from defendants Kuehne and Min and from defendant Chaykin's law firm *after* she was assigned this case. She refused to recuse herself, and she refused to even have a hearing on the issue of recusal.

72. These certain defendants are sued in their individual capacities for damages, because they have worked, sometimes in knowing collaboration, one with the other, to retaliate against Thompson for his public pronouncements about matters of public interest, including but not limited to The Bar's and the Supreme Court's collaboration with the porn-to-kids industry and its abuse of its regulatory powers to protect that porn industry from Thompson and to harm Thompson on their behalf and insistence. The prosecutorial bad faith, animus, and misconduct, proven years ago and which resulted in the payment of damages to Thompson, is now systemic and chronic as to Thompson for the reasons predicted by US Supreme Court Justice Douglas.

73. Indeed, a mere cursory reading of defendant Tunis' Referee's Report is an eye-opening account of regulatory animus shared by her that brazenly asserts that plaintiff should be permanently disbarred because he dared assert and tried to prove his innocence! This is a return to the Puritans' dunking tanks for witches until they confessed.

74. The persons sued for damages in their individual capacities are further liable by virtue of the fact, as indicated, that they have absolutely *no jurisdiction* over the actions of plaintiff in various regards and thus no immunity for their *ultra vires* acts. For example but not exhaustively, these persons have *no jurisdiction* to enforce Florida Bar Rules for actions that occurred in Alabama and to which only Alabama Bar Rules apply (see above). Where there is no jurisdiction and no authority to act, there is thus no immunity.

75. Further, in many of the actions taken by plaintiff, he had no client but was instead acting on behalf of the public interest. This is fatal to this prosecution. Florida Bar Rule 4-8.4(d), under which Thompson has been prosecuted, requires that a lawyer must be engaged "in the practice of law and on behalf of a client" for Rule 4-8.4(d) to apply. The Florida Supreme Court's own ruling in *Bar v. Brake* states just this. Thus, all actions taken by the persons sued in their individual capacities are *ultra vires* because they seek to punish Thompson for actions he did not even engage in through the practice of law, as the invoked Rule 4-8.4(d) mandates.

76. Further, as noted, state and federal law is clear that a public officer who acts without a state loyalty oath has no legal authority to act, and with no authority, there is no immunity.

77. The damage done to Thompson by these defendants, acting in their individual capacities, has resulted in loss of income, incurring by him of costs and expenses, infliction of mental and emotional distress, loss of reputation in the legal and general communities, with all harm to Thompson resulting from the deprivation of his federal legal and constitutional rights. All of this damage is compensable under 42 USC 1983.

78. Punitive damages are warranted against these individual defendants, as the acts of all defendants sued in their individual capacities are either intentional acts or undertaken with reckless or callous disregard for plaintiff's federal rights. Further, under federal common-law principles and case law, punitive damages are available against these defendants even absent actual damages.

79. WHEREFORE, plaintiff seeks compensatory and actual damages against all defendants sued in their individual capacities, along with attorney's fees pursuant to 42 USC 1988.

## COUNT II. INJUNCTIVE RELIEF UNDER 42 USC 1983

80. Plaintiff incorporates paragraphs 1 through 67 into this count.

81. Plaintiff sues in their "official capacity" all defendants named and identified in that fashion, above, as well as defendants The Florida Bar and the Florida Supreme Court, for injunctive relief to deliver plaintiff from ongoing harm prospectively.

82. Contrary to the prior arguments and position of The Florida Bar and the Supreme Court made in federal court and elsewhere, 42 USC 1983 is specifically designed to afford ***prospective*** relief for ongoing harm resulting from ongoing deprivations of a plaintiff's federal rights. There is absolutely no requirement, under ***any*** applicable abstention doctrine, that plaintiff must wait for the various defendants to completely destroy his career before he is entitled to relief. There is no requirement that he must exhaust his state remedies before seeking this federal injunctive relief. Plaintiff now knows and can prove to this court that the law does ***not*** support such a do-nothing approach by any federal court. 42 USC 1983 does not embody the old Miami joke of how does a Miami cop arrest a suspect. "Bang, put your hands up." Prior dismissals by

this and any other court on that basis were improper and must not again occur. Attached hereto as Exhibit B is the front cover of a wonderful book published by the American Bar Association that contains all the legal and constitutional authority that plaintiff will be citing to this court to reach a fair and just result and avoid the abstention dismissal that has made this situation far worse than it was when plaintiff first was entitled to federal relief. Plaintiff commends this primer, now it is Third Edition, it to all court personnel who wish to know what the law pertaining to 42 USC 1983 claims *really* is.

83. Plaintiff is presently operating under a ridiculous and illegal order of the Supreme Court that he cannot even respond to the Referee's Report. He cannot Petition for Review of that Report that itself helps prove the rank deprivations of Thompson's federal rights. He can file **_no_** defensive pleadings in his pending disciplinary matters. He is being denied, presently and without any legal authority to do so, his *absolute right* to defend himself in the current disciplinary proceedings. As the former nurse witness in Paul Newman's movie *The Verdict,* shouted from the witness box: "Who are these people who would do this to me? I wanted to be a nurse!" Plaintiff wanted to be a lawyer, and no cabal of porn lawyers and obscurantist state judges and self-important and self-righteous regulatory bureaucrats is going to deny the undersigned his right to defend himself in efforts to remain a lawyer. This court, whether is agrees with the plaintiff on his social agenda or not, should agree with him on at least that point: that plaintiff has a right to defend himself right this second.

84. Why is this right to defend himself at the core of this entire mess that prompts this suit? Because all of the attorneys Thompson has secured to act on his behalf have been driven off by the various defendants' threats of disciplinary action against them.

The Bar stole one of his lawyer's medical records and blackmailed him out of Thompson's case. These are not imaginings. These are facts. Thus, the Supreme Court's assertion that Thompson still has access to the Supreme Court to defend himself is absurd and demonstrably false. It is beyond that. It is a lie by the highest court in this state. No lawyer can represent Thompson because to do so is to put himself/herself in the same regulatory jeopardy that Thompson finds himself in. What kind of person, what kind of jurist, would convey: Oh, you can hire an attorney, but that attorney will have Hell to pay.

85. As already noted, in various ways and for various reasons, not all of which are recited nor need be herein, these persons are sued in their official capacities because they lack even the simplest jurisdictional basis to prosecute or more accurately harass Thompson, in the name of "lawyer discipline." Thus injunctive relief for lack of jurisdiction for these *ultra vires* acts purporting to occur under color of state law, must be given, as there is clearly no theory of immunity in a situation such as this that defeats prospective injunctive relief.

86. So as not to be accused of shotgun pleading, Thompson states here in this count, as noted previously elsewhere, that he is being prosecuted for "the practice of law" when the Supreme Court has ruled that "the practice of law" must be on behalf of a client. Thompson had no client in much of what he is accused of doing, so the Rule 4-8.4(d) Rules violations are nullities.

87. Thompson is being prosecuted under Florida Bar Rules when only substantive Alabama Bar Rules can be applied to his Alabama conduct. There is thus *absolutely no jurisdiction* to proceed against him under substantive Florida Bar Rules for

those actions, and Referee Tunis in effect admits just that by magically deleting any reference to Alabama Bar Rules from her Referee's Report despite their being in the charging documents. This is like a dentist being authorized to fill a cavity and proudly announcing, "Well, your pedicure is done!" A government official without jurisdiction to act has no authority to act, and he/she must be enjoined from doing so. Thompson could provide proof of more fatal jurisdictional defects, but this complaint is just a start and sufficiently so under notice pleading. What Thompson needs is an order directing the defendants, sued in this official capacities, to start giving him some due process denied him for more than four years.

88. Further, defendants Bateman and Hill are employees of The Bar who presently refuse to honor document requests made pursuant to Florida Rules of Civil Procedure and Florida Public Records Law, Chapter 119, Florida Statutes, and in doing so these two Bar employees seek to deny Thompson the very documents by which he could defend and exonerate himself in his disciplinary proceedings and also prove his claims in this federal action. These two, along with other defendants, are trying to "run out the clock" in the disciplinary proceedings in order that plaintiff herein will have nothing and no one to enjoin once he is permanently disbarred. They are trying to assure that the only relief Thompson might have would be a direct appeal to the US Supreme Court once he is disbarred. They are angling for *Rooker-Feldman* abstention by seeking to frustrate every timely request for due process and other federal rights. Yet Thompson is now entitled to due process and to the exercise of his other federal constitutional and legal rights prior to that disbarment by means of *prospective injunctive relief*.

89. Two additional disturbing data underscore why prospective injunctive relief must be granted now. The Florida Supreme Court has actually undertaken, on its own initiative, to review whether or not The Bar is acting improperly in seeking discipline of Broward Attorney Sean Conway in response to his calling a sitting judge an "evil witch" and "mentally ill." The Supreme Court is concerned that Mr. Conway may have a First Amendment right to comment about a judge in that hurtful fashion.

90. Those hyperbolic comments by Conway about a judge far exceed the fact-based assertions Thompson has made about two judges, and yet Thompson and Conway are both being pursued under the same Rule 4-8.2(a). Any fair-minded tribunal would stay Thompson's disciplinary case as it pertain to Rule 4-8.2(a) in order that whatever the Supreme Court decides is the meaning and reach of the First Amendment as to criticism of judges might be decided and then applied equally to Conway and Thompson.

91. However, the Supreme Court refuses to do that, thereby proving that it is operating as if it has issued a Bill of Attainder, treating Thompson as a special target. There is to be one First Amendment for a liberal criminal defense lawyer in Broward, and then another First Amendment for Thompson. The Supreme Court is now supposedly so concerned about the First Amendment, that it demanded the opportunity to review Rule 4-8.2(a) after Conway pled guilty and agreed to a reprimand! Thompson is thus being denied equal protection of the laws guaranteed under the Fourteenth Amendment and remediable by prospective injunctive relief under 42 USC 1983.

92. As to the second datum: So intent are The Bar and the Supreme Court to harm Thompson that both are willing to put at risk, through a special assessment, the assets of The Bar and its members, as indicated by the fact that The Bar waived all

coverage and all rights of defense to be afforded by its insurance carrier, Nationwide, in any damages claim brought by plaintiff. The Bar did this, Thompson only now finds, years ago, and The Bar, despite Thompson's repeated requests about insurance coverage, refused to tell him of this waiver. Nationwide recently let this fact slip out inadvertently to Thompson. This is fraud. Also, The Bar is thus violating its own By-Laws by opting for self-insurance, which is forbidden, in order to have no interference from an insurance carrier in its headlong pursuit of Thompson and the deprivation of his rights.

93. The reason that The Bar is doing this is that the last time The Bar sought to harm Thompson, back in the early 1990's, see above, the Bar's insurance carrier made it stop when its claims representative said, "This is the worst thing I have ever seen an insured do to anyone."

94. Thus, it is clear that the defendants who are sued in their official capacities will not stop unless ordered to stop in their maniacal, tortious pursuit of Thompson

95. WHEREFORE, plaintiff seeks a preliminary injunction immediately enjoining The Bar, the Supreme Court, and the other defendants (persons) sued in their official capacities from further proceeding against plaintiff because he can show a substantial likelihood of success on the merits, irreparable harm (including permanent disbarment) unless the injunction issues, including public damage to his career, that this harm far outweighs any conceivable harm to defendants if the injunction issues, and that the injunction will not disserve but actually serve the public interest.

## COUNT III. DECLARATORY RELIEF

96. Plaintiff incorporates paragraph 1 through 67 into this count.

97. Plaintiff seeks a declaratory judgment against defendants The Bar and the Florida Supreme Court and as to all other defendants sued in their official capacities in a number of regards:

a. The US Supreme Court in *Keller v. State Bar of California*, 496 US 1 (1990) held unanimously that any integrated state bar that goes beyond its legitimate functions will be treated as a labor organization which cannot, by virtue of its *ultra vires* acts, continue to compel membership therein. This Bar, in violation of *Keller*, is using "discipline" for reasons that have absolutely nothing to do with discipline and have everything to do with ideology. This Bar's own *Preamble* prohibits this, let alone the prohibitions found in *Keller*.

Florida is a right-to-work state, guaranteed to be such by the Florida Constitution. By virtue of Florida's being one of the few right-to-work states in the Union, its requirement of compulsory membership by lawyers in an integrated state bar cannot be harmonized with this constitutional provision against closed shops. This disharmony is particularly disfavored and untenable in light of the fact that The Florida Bar is using "discipline" in violation of *Keller* to fashion the ideology-driven "goose-stepping brigades" predicted by Justice Douglas in Lathrop, which opinion laid the groundwork for the ruling in *Keller*. Thompson was accused by Referee Tunis of trying to enlist her into his "culture war." Nonsense. The Bar is trying to punish Thompson for objecting to its culture war.

If The Florida Bar did not want to highlight the insoluble problem that arises when an integrated bar seeks to function in a right-to-work state, then it should have been

careful not to act like the union boss thugs whose excesses gave rise to the right-to-work laws.

In point of fact, there is absolutely no provision in the Florida Constitution authorizing creation of The Florida Bar. It is an entity that the Supreme Court has simply created out of thin air with all the legal authority and *gravitas* that thin air carries.

Wherefore, plaintiff seeks a declaratory judgment that Florida's right-to-work constitutional provision and guarantee prohibits the maintenance of The Bar's closed shop by means of an integrated state bar system. Such a judgment would free Thompson and others from compulsory membership in this organization that increasingly is not concerned about providing quality legal services to the public but is rather the Thought and Speech Police envisioned and promoted by former Justice and now defendant Raoul Cantero.

b. In 1991, the American Bar Association issued its McKay Commission Report which was extremely critical of state bars' disciplinary structures, most importantly the placement of bar discipline under elected bar governors/officials, who could be counted upon, the McKay Report noted, to politicize the disciplinary process. The McKay Report sternly warned that building a Chinese Wall between bar discipline and bar governors was the *sine qua non* of state bar discipline reform. Subsequent to the issuance of the McKay Report, a poll of all Florida Bar members proved that this politicization of Bar discipline had occurred. See Bar President Miles McGrane's Florida Bar Poll.

Sitting on the ABA McKay Commission, agreeing with its findings and recommendations, was none other than John Berry of The Florida Bar, a defendant herein, who now presides over a state bar disciplinary system that subverts much of what

the ABA's McKay Commission said must be done to protect lawyers from the very nonsense and illegal activities that The Bar and Mr. Berry are now visiting upon plaintiff Thompson and others. What an interesting deposition it will be to ask Mr. Berry if he now disavows the very ABA Report that he authored.

The Founders of this nation, prescient as they were about so many things and distrustful of the centripetalization of governmental power, wrote into the US Constitution Article IV, Section 4: "The United States shall guarantee to every State in this Union a Republican Form of Government…"

As highlighted by the ABA McKay Report, the melding of all three functions of government—executive, legislative, and judicial—has resulted in a Bar that is a closed system that makes the rules, prosecutes the rules, and judges the lapses of the rules. As such, the Supreme Court and its official arm, The Bar, it is answerable to no one and thus has lived up to Lord Acton's warning that "Absolute power corrupts absolutely." This Bar disciplinary system is a fully closed system, which is answerable to no one, is more easily hijacked and twisted into a weapon of great harm by a Board of Governors so drunk with power that it has even forgotten what Bar discipline is for.

In fact, when Thompson asked The Bar to disclose, during what was supposed to be the discovery process leading up to his trial, "what harm has Thompson had done to the legal system, to the public, to a client, to a judge, to an opponent, or to anyone," (see 2007 interrogatories propounded to The Bar) The Bar answered: "To identify the harm would be to call for a legal conclusion." The Bar refuses to identify any harm done by Thompson because there was none, and yet Thompson is to be disbarred by a Bar and

Court that refuses to put him on notice as to anyone whom he harmed. This is not due process.

As noted above, there is no basis in the Florida Constitution for the creation of The Florida Bar. What is not authorized is not necessary, particularly went it cannot or will not even enunciate what harm it has been created to avert.

WHEREFORE, The Bar, run by politically-driven Governors and in pursuit of discipline for reasons it cannot even identify, let alone enunciate, must be adjudicated, by means of a declaratory judgment, to be violative of Article IV, Section 4 of the United States Constitution, and relief granted based upon that finding. One possible remedy might be a disciplinary system truly overseen and answerable to the Supreme Court, with the very structural and procedural safeguards that the McKay Commission, and its Mr. Berry, sought.

c. As recounted in the general factual allegations in this complaint, The Bar and the Supreme Court have engaged in deprivations of various federal legal and constitutional rights as set forth therein.

WHEREFORE, plaintiff seeks a declaratory judgment affirming the fact that those specific deprivations have occurred and must cease, as well as a granting that all necessary relief flowing from that judgment in order to assure that the deprivations must and will stop.

d. Plaintiff at the very least seeks declaratory relief from the consequential mistake that The Florida Bar and the Florida Supreme Court seek to prosecute him under Florida Bar Rules for behavior that is only punishable pursuant to substantive Alabama Bar Rules.

WHEREFORE, plaintiff seeks a declaratory judgment, and an enabling injunction enforcing and giving it full force and effect, that Thompson must be prosecuted only for what he did in Alabama in the "Alabama Bar Complaint" that impacted, allegedly, the tribunal there, under Alabama Bar Rules only, as Florida Bar Rules themselves mandate.

e. Eleventh Amendment sovereign immunity, as well as any other form or theory of immunity, does not bar this action, and plaintiff seeks a declaratory judgment to that effect in a number of regards.

The bases for this assertion are many, and they include but are not limited to the fact that:

(1) Pursuit of "discipline" of a lawyer is not protected by "judicial immunity," as such regulatory activity is clearly not a purely judicial act. It is a regulatory act, and only qualified immunity, if any attaches to non-judicial acts.

(2) Any damages assessed against The Bar will not be against the State Treasury, and thus the main premise and concern undergirding Eleventh Amendment Immunity— that the sovereign cannot be sued—is defeated. The Bar, although it claims to be a state agency, and clearly is operating under color of state law, claims to be the state when it finds it convenient to say so and then claims it is not the state when it is convenient to say that it is not. For example, state law requires the employees of all "state agencies" to execute State Loyalty Oaths. Yet all Bar employees refuse to execute them, claiming that they are not state employees. Fine, then The Bar cannot claim sovereign immunity when it says in certain settings that the requirements of the sovereign need not be met.

(3) The accumulation of law surrounding 42 USC 1983 claims makes it clear that when any state official, acting under color of state law, acts in reckless disregard of

his duties in that capacity, in effect knowingly or recklessly acting *ultra vires*, then he strips himself of the sovereign's protection. If he acts like a rogue, then he is to be treated, under the law, as if he were a rogue. An emperor without authority not only has not clothes; he has no right even to wear the protective clothes provided to the sovereign.

f. Finally, Article VI, Clause 2 of the United States Constitution states:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and ***the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.***" [emphasis added]

The Florida Supreme Court and its Justices are not free to pick and choose what portions of the United States Constitution they choose to obey and which ones they do not. They are *under* the Constitution, not on an equal footing with it.

It is not surprising that Justices who were unable to get around to comply with the federal constitution, with a federal statute, with a state constitution, and a state law, FS 876.05, all of which mandated that they must execute and file State Loyalty Oaths, would be the same kind of Justices who would treat as a mere inconvenience plaintiff's federal legal and constitutional rights. An oath not executed is one that can be ignored.

WHEREFORE, plaintiff seeks a declaratory judgment and an injunctive relief necessary to enforce it, commanding all defendants to comply with Article VI, Clause 2 of the United States Constitution.

## COUNT IV.  PENDENT STATE CLAIMS

98.  Plaintiff incorporates paragraphs 1 through 67 into this count.

99.  By virtue of 28 USC 1367, this court, within a 42 USC 1983 action, has jurisdiction over pendent state claims related to the federal claim or claims, and they are as follows:

a.  Florida Statute 447.17 affords plaintiff a civil remedy for damages and injunctive relief resulting from The Bar's and the Supreme Court's violation of Florida's right-to-work laws and constitutional provision.

WHEREFORE, plaintiff hereby seeks all relief available to him under the aforementioned statute.

b.  Florida Statute 768.295 is Florida's Anti-SLAPP Statute, and it prohibits the bringing of any action by the state of Florida in retaliation against any citizen who has exercised his petition rights under the First Amendment.  It provides for injunctive relief, and also an award of monetary damages, and attorneys fees.

The retributive action taken by the Florida Supreme Court and The Florida Bar, both on behalf of the State of Florida, is in retaliation for the exercise of Thompson's petition rights exercised in complaining to various state officials about the illegal actions of the Supreme Court, The Bar, and about others, such as Thompson's complaints to Governor Bush about the hypocrisy of Al Cardenas.

WHEREFORE, plaintiff seeks any and all relief available to him under FS 768.295, Florida's Anti-SLAPP statute, as the State of Florida, through The Bar, is in willful violation of that law.

c. Florida Statute 761.01, *et sequitur*, is called Florida's Religious Freedom Restoration Act. Held constitutional by the United States Supreme Court, it prohibits the State of Florida from infringing upon one's right to exercise his religion, even if the exercise thereof is in the form of activity not even central to the core mandates of that religion.

The State of Florida, through the Florida Supreme Court and Bar, officially determined that the plaintiff does what he does against corporations who distribute adult pornographic and violent material to minors because of his Christian faith. That is a formal finding generated by the Supreme Court and The Bar. They are stuck with it.

Thus, the subsequent and now ongoing efforts to punish plaintiff for the exercise of his Christian faith are barred by this prior formal finding, in application of FS 761.01.

WHEREFORE, plaintiff seeks all remedies under FS 761.01, including injunctive relief, the award of damages, and the award of attorney's fees.

d. Plaintiff seeks any other relief, in whatever form, of any other rights he has or may have under Florida laws and its Constitution.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury of all issues so triable.

JOHN B. THOMPSON, Plaintiff
Attorney, Florida Bar #231665
5721 Riviera Drive
Coral Gables, Florida 33146
Phone: 305-666-4366
amendmentone@comcast.net

# OUT OF HARM'S WAY

"THIS LUNATIC LAWYER IN MIAMI GOT ME OFF THE AIR." HOWARD STERN

# OUT OF HARM'S WAY

One man's relentless crusade to topple media giants and save your kids from video game madness



## JACK THOMPSON

(Spine text) OUT OF HARM'S WAY △ THOMPSON



# SWORD
# AND
# SHIELD

### THIRD EDITION

A Practical Approach to
Section 1983 Litigation

Mary Massaron Ross
Edwin P. Voss, Jr.





# 08-22603-CIV-ALTONAGA/BROWN

🖎 JS 44 (Rev. 2/08)

**CIVIL COVER SHEET**

FILED by __IG__ D.C.
ELECTRONIC

SEPT 19, 2008

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as req
by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of C
the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)   NOTICE: Attorneys MUST Indicate All Re-filed Ca

## I. (a) PLAINTIFFS

John B. Thompson

## DEFENDANTS

**(b)** County of Residence of First Listed Plaintiff   Miami-Dade
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   Miami-Dade
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

5721 Riviera Dr.
Coral Gables, FL 33146

Attorneys (If Known)

**(d)** Check County Where Action Arose: ☒ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☐ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE
HIGHLANDS

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☒ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)   and One Box for Defendant

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

Date 08cv22603-Altonaga/Brown

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. Security | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | ☐ 900 Appeal of Fee Determination |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of State |
| | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus-Alien Detainee | | Statutes |
| | ☒ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Re-filed-
(see VI below)

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. RELATED/RE-FILED CASE(S).

(See instructions
second page):

a) Re-filed Case ☐ YES ☒ NO      b) Related Cases ☐ YES ☒ NO

JUDGE                    DOCKET NUMBER

## VII. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause (Do not cite jurisdictional statutes unless diversity):

LENGTH OF TRIAL via __5__ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

SIGNATURE OF ATTORNEY OF RECORD
s/ JB Thompson

DATE 9/19/08

**FOR OFFICE USE ONLY**

AMOUNT 350.-   RECEIPT # 987487  IFP